IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| ROBERT WHITLEY, | ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-01411 (RDA/TCB) |
| | ) | |
| SECTEK, INC., | ) | |
| | ) | |
|    Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on the Motion for Summary Judgment brought by Defendant SecTek, Inc. ("Defendant" or "Company"). Dkt. 31. The Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering Defendant's Memorandum in Support (Dkt. 32), Plaintiff's Opposition (Dkt. 46), and Defendant's Reply (Dkt. 54), it is hereby ORDERED that Defendant's Motion is DENIED for the reasons that follow.

I.  BACKGROUND

Although the parties dispute certain facts, the following facts are uncontested except where noted.

Defendant is a Virginia corporation offering security and protective services for public and private entities. Plaintiff began working as an employee of Defendant in 2006 and, prior to his termination, he had most recently been assigned as a shift supervisor at the United States Patent and Trademark Office ("USPTO"), where he had worked since 2012. Plaintiff held the title of Lieutenant and was responsible for the supervision of approximately 25 security officers. One of those officers was Ms. Franchesca Sylver, who began work for Defendant in March of 2012 and

1

resigned in August of 2020.  Dkt. 32-3 at 3.  Plaintiff had supervised Ms. Sylver since 2014 and the two developed a friendly relationship.  The two often divulged personal circumstances to one another including the happenings of their respective families either via in-person conversation or over text message.  In fact, Plaintiff sent gifts to Ms. Sylver's daughter for holidays and supported her cheerleading fundraiser efforts.  It is not contested that Ms. Sylver appeared supportive of Plaintiff's gifts to her daughter.  *See, e.g.*, Dkt. 47-4 at 1; Dkt. 47-5 (thank you videos from Ms. Sylver's daughter); Dkt. 47-6 at 1; Dkt. 47-6 at 1 (text message to Plaintiff stating "Maci and I thank you for all your support!").

In the summer of 2017, Plaintiff alleges that he was advised by Defendant's Vice-President and then-USPTO Program Manager, Mr. Doug Daniels, that the Company would be shifting away from the disciplinary points matrix to a more progressive disciplinary criteria because "[t]oo many security guards were being automatically terminated" which was creating "economic and training problems for the [C]ompany."  Dkt. 47-1 ¶ 12.  But due to complaints from the USPTO that Defendant's security personnel were not adequately performing their duties, by June of 2018, the new USPTO Program Manager, Mr. Sean Storms, notified all supervisors, including Plaintiff, to "tighten up on discipline."  *Id.* ¶ 13.

In March of 2018, Plaintiff texted with Ms. Sylver about his plans to vacation on a cruise in the Caribbean and shared a number of texts and photos of him and his wife enjoying the cruise.  According to Plaintiff, Ms. Sylver "expressed delight at these texts."  Dkt. 47-1 ¶ 8.  In connection with that trip, Plaintiff shared with Ms. Sylver a photograph of a personal trainer wearing a revealing bikini.  Plaintiff claims that Ms. Sylver wanted to see the photograph upon learning that Plaintiff's wife had been inspired by it.  *Id.* ¶ 9.

2

Following a series of warning texts to Ms. Sylver related to her alleged inattentiveness while on duty and her tendency to allow "congregating on post," Plaintiff reported to Mr. Storms, on July 19, 2018, that Ms. Sylver had been texting on her personal phone while on duty. *Id.* ¶¶ 14, 16. Ms. Sylver was disciplined under the new progressive disciplinary regime and received a one-day suspension. *Id.* ¶ 16.

Weeks later, in early August of 2018, Ms. Sylver filed a complaint with the then in-house corporate counsel, Ms. Deborah Leahy, which described a number of incidents that Ms. Sylver considered to be "stalking, harassment and misuse of government property." Dkt. 47-23 at 3. According to Ms. Sylver, and admitted to by Plaintiff, (1) on March 23, 2018, Plaintiff texted Ms. Sylver a picture of a woman in a bikini; (2) on April 13, 2018, Plaintiff took pictures of Ms. Sylver in her security uniform and posted them on Instagram; (3) on May 2, 2018, Plaintiff sent Ms. Sylver a picture of a rubber-banded roll of money; (4) on May 5, 2018, Plaintiff sent a picture of another officer asleep at a post to Ms. Sylver; (5) on June 15, 2018, Plaintiff texted Ms. Sylver "Get your Butt inside"; and (6) Plaintiff sent a video message to Ms. Sylver's daughter stating that if Ms. Sylver did not show up to work the next day he would "punch mommy in the nose" and "throw a snowball at her." *See* Dkt. 47-23; Dkt. 47-5; Dkt. 32-1 at 6-9, 22-23; Dkt. 32-10.[1] Plaintiff disputes other aspects of the complaint letter filed by Ms. Sylver.

After receiving Ms. Sylver's complaint, Ms. Leahy met with Plaintiff and Ms. Sylver separately to discuss the matters alleged.[2] Ms. Leahy then compiled a report on the matter and

---

[1] The video depicts Plaintiff sitting at Ms. Sylver's post filling in for her when she was unable to come into work due to inclement weather. Plaintiff is seen smiling at the end of the video. Plaintiff further alleges that these apparent threats were made "facetiously." Dkt. 47-1 ¶ 10.

[2] Plaintiff contests that the Project Manager for Defendant's security contract with the USPTO, Mr. Sean Storms, conducted an investigation into Ms. Sylver's complaint upon the

3

recommended the termination of Plaintiff for violating the Company's sexual harassment policy when Plaintiff sent Ms. Sylver a picture of a woman in a bikini. Ms. Leahy also noted Plaintiff's violation of Defendant's disciplinary charges for his alleged conduct related to texts he had sent to Ms. Sylver and her daughter. While Ms. Leahy did make these findings following her investigation, she also noted that she did not find Ms. Sylver to be credible as to at least two of her allegations and that at least one of Ms. Sylver's witnesses "lied." Dkt. 47-22 at 12-14. Indeed, Ms. Leahy recommended further investigation into the witness who allegedly lied. Additionally, Ms. Leahy recommended that Mr. Storms be terminated for having violated the Company's sexual harassment policy for having "ignored" the situation involving Plaintiff and Ms. Sylver.[3]

During the investigation into Ms. Sylver's complaint, Ms. Leahy received another complaint against Plaintiff regarding his alleged harassment of another security officer on the basis of his Muslim faith. Dkt. 32-11.[4]

On September 28, 2018, Plaintiff claims he was summoned to Mr. Daniel's corporate office, where Mr. Daniels told him he was going to be fired. Upon protest, Plaintiff claims that Mr. Daniels said that Mr. Blood was a "paranoid m*****f******" and that "it was better for the company to fire [Plaintiff] than contend with a female employee claiming sex harassment at work." Dkt. 47-1 ¶ 30.[5] That day, Plaintiff then emailed Mr. Blood requesting that he reconsider "the pending termination." Dkt. 47-24 at 2. Mr. Blood responded to the email informing Plaintiff that

---

request of Ms. Leahy and reported back that the complaint was without merit. Dkt. 47-2. Defendant maintains that Mr. Storms never conducted such an investigation. *See* Dkt. 32 at 5-6.

[3] Again, Plaintiff contests that Mr. Storms ignored the situation.

[4] Plaintiff denies this allegation in its entirety. Dkt. 47-1 ¶ 35.

[5] Defendant contests this alleged fact on the grounds that Mr. Daniels outright denied it in his affidavit. *See* Dkt. 32-8 ¶ 6.

4

he "may submit additional information to counsel, and/or [he] may schedule a meeting with [Ms. Leahy] to discuss the investigation." *Id.* at 1. Mr. Blood further advised Plaintiff that "[a]ny additional information you submit will be taken into consideration." *Id.*

On October 1, 2018, Ms. Leslie Howard-Watts began her job at the Company as Director of Human Resources. That same day, Ms. Leahy provided a copy of her report to Ms. Howard-Watts and upon review of the report, Ms. Howard-Watts decided to move forward with terminating Plaintiff; sending Plaintiff a notice of pending termination if Plaintiff did not willingly resign. Dkt. 32-4 at 9; Dkt. 47-25. To Ms. Howard-Watt's knowledge, she was the "sole decider."[6] *Id.*; *see also* Dkt. 32-8 ¶ 4 (Mr. Daniels stating that he had no involvement in the decision to terminate Plaintiff); Dkt. 32-9 ¶ 4 (Mr. Blood stating that he had no involvement in the decision to terminate Plaintiff). On October 10, 2018, Ms. Howard-Watts sent an official termination letter to Plaintiff notifying him that in addition to the allegation of harassment filed by Ms. Sylver, the Company had found "considerable evidence" that Plaintiff "committed harassment based upon an employee's religion as it related to his request for a shaving waiver due to his religion." Dkt. 47-26 at 1. The termination notice made clear that Plaintiff's employment was terminated effective October 1, 2018 "due to this conduct." *Id.*

Plaintiff has sued Defendant pursuant to Title VII of the Civil Rights Act of 1964 for sex-based discrimination, alleging that "[b]y firing [him] because it was easier to fire a man wrongfully

---

[6] Plaintiff contests this point and instead asserts that the CEO of the Company, Wilfred Blood, told Mr. Storms that "[i]t is easier and cheaper to fire a man rather than fight a woman who filed sexual harassment claims. Just look at the news." Dkt. 47-2 ¶ 29; *but see* Dkt. 32-9 ¶ 5 (Mr. Blood denies that he ever made the statement "that it was easier for the company to fire a man, regardless of the merits of the complaints against him, than to fire a woman claiming sex harassment" or anything similar to that).

5

accused of sex harassment than contend with a female employee who had so accused him, [Defendant] discriminated against [him] on the basis of his sex." Dkt. 1 ¶ 25.

### B. Procedural Background

Plaintiff filed his Complaint on November 18, 2020. Dkt. 1. On February 10, 2021, Defendant filed a Rule 12(b)(6) motion to dismiss and this Court denied that motion on August 13, 2021. Dkt. Nos. 6; 12. This Court then entered a scheduling order setting the close of discovery for January 14, 2022. Dkt. 16. On January 19, 2022, the parties filed their witness and exhibit lists. Dkt. Nos. 19; 22. Two days later, Plaintiff filed a revised exhibit list. Dkt. 23. On January 26, 2022, this Court held a final pretrial conference and set a jury trial for April 5, 2022. Dkt. 25. On February 11, 2022, Defendant filed its Motion for Summary Judgment as well as its Memorandum in Support. Dkt. Nos. 31; 32. On February 18, 2022, this Court issued a trial order. Dkt. 36. On February 25, 2022, Plaintiff filed his Opposition. Dkt. 46. And on March 3, 2022, Defendant filed its Reply. Dkt. 54. On March 16, 2022, this Court heard argument on numerous motions *in limine* filed by the parties and decided those motions by March 17, 2022. Dkt. Nos. 61; 62. Defendant's Motion for Summary Judgment is the only outstanding pretrial motion left to decide in this matter.

### II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the record shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 615 (E.D. Va. 2014) (quoting Fed. R. Civ. P. 56(a)). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Hantz*, 11 F. Supp. 3d at

6

615-16 (quoting *Spriggs v. Diamond Auto. Glass*, 242 F.3d 179, 183 (4th Cir. 2001)). The moving party bears the "initial burden to show the absence of a material fact." *Sutherland v. SOS Intern., Ltd.*, 541 F. Supp. 2d 787, 789 (E.D. Va. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

On summary judgment, a court reviews the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 570 (4th Cir. 2015) (quoting *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)); *McMahan v. Adept Process Servs., Inc.*, 786 F. Supp. 2d 1128, 1134-35 (E.D. Va. 2011) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). This is a "fundamental principle" that guides a court as it determines whether a genuine dispute of material fact within the meaning of Rule 56 exists. *Jacobs*, 780 F.3d at 570. "[A]t the summary judgment stage[,] the [Court's] function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A factual dispute alone is not enough to preclude summary judgment. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). The substantive law determines whether a fact is considered "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material

7

fact" arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 248.

## III.  ANALYSIS

Defendant argues that there is no direct evidence of discrimination in connection with its decision to terminate Plaintiff's employment.  First, Defendant argues that Plaintiff relies entirely on two alleged statements of Mr. Blood and Mr. Daniels regarding the company's interest in not contending with a sexual harassment lawsuit from a woman.  Defendant emphasizes that both Mr. Blood and Mr. Daniels deny ever making these statements.  Moreover, Defendant maintains that these statements are not material to the dispute because Plaintiff cannot present any evidence that Mr. Blood or Mr. Daniels were involved in the Company's decision to terminate Plaintiff.  Without that ability, Defendant cites to Fourth Circuit precedent observing that "statements of non-decisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden" of proving discrimination.  Dkt. 32 at 15 (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).  According to Defendant, unless Plaintiff could proffer evidence demonstrating that Ms. Leahy's investigation was influenced by a tinge of discrimination sufficient to taint Ms. Howard-Watts' reliance on Ms. Leahy's report, Plaintiff is without a direct discrimination claim as a matter of law.

Defendant also asserts that Plaintiff's case for indirect evidence of discrimination cannot meet the *McDonnell Douglas* framework on which this circuit relies.  First, Plaintiff's job performance was not satisfactory due to the sexual and religious harassment allegations brought against him.  Second, Plaintiff has not shown evidence of different treatment from similarly situated employees outside the protected class.  And, even if Plaintiff could surmount these evidentiary burdens, Defendant has provided a nondiscriminatory reason in terminating Plaintiff.

8

Lastly, Plaintiff has not shown by a preponderance of the evidence that Defendant's stated reasons for Plaintiff's termination "were not its true reasons, but were a pretext for discrimination." Dkt. 32 at 17 (citing *Hill*, 354 F.3d at 285).

Plaintiff, in turn, argues that this case is replete with material factual and credibility conflicts requiring that the case be put to a jury to decide whether Plaintiff's termination was brought on, at least in part, by the fact that Plaintiff was a man and his accuser a woman. For purposes of material factual disputes, Plaintiff maintains that the following factual determinations remain open for a jury to decide: (1) the exchanges between Plaintiff and Ms. Sylver in establishing whether Ms. Sylver's complaint was a retaliatory action and therefore without merit; (2) what Plaintiff said to Mr. Mirza, the security officer who filed a religious harassment claim against Plaintiff; (3) whether Mr. Storms investigated Ms. Sylver's complaint and his resulting findings and recommendations; (4) whether Mr. Daniels told Plaintiff it was better for the Company to fire him than Ms. Sylver to avoid unnecessary problems and that Plaintiff would have a wrongful termination claim if fired; (5) whether Mr. Blood told Mr. Storms that it was preferable to fire a man over a woman claiming sexual harassment; (6) whether Ms. Howard-Watts was the sole decision maker in deciding to terminate Plaintiff; and (7) whether Plaintiff was fired solely for his alleged sexual harassment of Ms. Sylver.

As to credibility disputes, Plaintiff also insists that a jury must assess the trustworthiness of Mr. Daniels' and Mr. Blood's testimony regarding Mr. Storms' alleged investigation. Plaintiff maintains that a jury should consider their testimony along with the testimony of Ms. Howard-Watts as to the mechanics of, and reasoning behind, the decision to fire Plaintiff in light of their respective affidavits that conflict with those of Plaintiff and Mr. Storms.

Plaintiff further contends that a jury could find Ms. Howard-Watts to have served as Defendant's scapegoat in order to attempt to avoid any accusations of discriminatory motive in terminating Plaintiff.  To conclude, Plaintiff argues that this is at best a mixed-motive case because Ms. Leahy's report recommended termination on the basis of Plaintiff's alleged sexual harassment *and* violating the Company's disciplinary charges.  Therefore, Plaintiff asserts he "need only present sufficient evidence for a reasonable jury to conclude" that "sex" was a "motivating factor" in the termination and that no direct evidence of discrimination is needed to overcome a summary judgment motion.  Dkt. 46 at 24-25 (citing *Desert Palace Inc. v. Costa*, 539 U.S. 90, 101 (2003)).

To decide whether this matter should go to a jury, this Court must assess whether Plaintiff has produced sufficient evidence that creates a dispute as to a material fact in this case.  Because Defendant has filed the present Motion, this Court must draw all reasonable inferences in favor of the Plaintiff.  *Jacobs*, 780 F.3d at 570.

Under Title VII of the Civil Rights Act of 1964, it is "unlawful . . . for an employer . . . to discharge any individual . . . because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e- 2(a)(1) (2021).  Moreover, "an unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Under Title VII, sex discrimination is generally evaluated using "the traditional but-for causation standard[,]" though under certain circumstances, plaintiffs may also prevail "by showing that a protected trait like sex was a 'motivating factor' in a defendant's challenged employment practice." *Bostock v. Clayton Cty.,* 140 S. Ct. 1731, 1739 (2020); *see also Philips v. Martin Marietta Corp.*, 400 U.S. 542, 543-44 (2021).  "If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have

10

yielded a different choice by the employer—a statutory violation has occurred." *Bostock*, 140 S. Ct. at 1741.

"'Plaintiffs may prove . . .violations of Title VII either through direct and indirect evidence of retaliatory animus,' referred to as the mixed-motive framework, 'or through the burden shifting framework of *McDonnell Douglas*[.]" *Finkle v. Howard Cty.*, 640 F. App'x 245, 247 (4th Cir. 2016) (quoting *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)). "Direct evidence must be evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir 2006). In Title VII cases involving a mixed-motive for why an employer elected to terminate an employee, a plaintiff only has the burden of proving by a preponderance of the evidence that he "suffered adverse work conditions" and that his sex "was a motivating factor in any such work conditions imposed upon [him]." *Desert Palace*, 539 U.S. at 96 (quoting *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 858 (9th Cir. 2002)). "[D]irect evidence of discrimination is not required in mixed-motive cases." *Id.* at 101-02.

Only if a plaintiff cannot present direct evidence of a discriminatory motive in the decision to terminate *and* the employer did not terminate the plaintiff on a mixed-motive basis does the Court then look to apply the *McDonnell Douglas* framework for indirect circumstantial evidence of the like. First, "the plaintiff must establish a prima facie case of discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). That showing requires the plaintiff prove "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and[,] (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004)). If the plaintiff succeeds, he "creates

11

a rebuttable presumption that the employer has unlawfully discriminated against him." *Cook v. CSX Transp. Corp.*, 988 F2d 507, 511 (4th Cir. 1993). The employer must then "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill*, 354 F.3d at 285. If the employer can satisfy that burden, the plaintiff must then "prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were pretext for discrimination.'" *Id.* (quoting *Reeves*, 530 U.S. at 143).

In the context of evaluating employment decisions, courts are not "a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998); *see also EEOC v. Clay Printing Co.,* 955 F.2d 936, 946 (4th Cir. 1992) ("It is not the purpose of the EEOC nor the function of this court to second guess the wisdom of business decisions."). A court must not assess whether a company's termination decision was "wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette*, 133 F.3d at 299 (quoting *Giannopolis v. Brach & Brock Confections, Inc*., 109 F.3d 406, 410 (7th Cir. 1997)). Whether the alleged conduct giving rise to the company's decision to terminate an employee actually occurred is "irrelevant" so long as "the decisionmaker believed that he did" commit such conduct. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007).

To be sure, the facts of this case differ from those in *Clay Printing*. There, an employer's statement could be stretched no further than to be considered code for age discrimination. Here, the statements Plaintiff and Mr. Storms claim were made by Mr. Daniels and Mr. Blood, respectively, *directly* mention predicating termination decisions on the basis of the sex of Plaintiff as compared to Ms. Sylver. Moreover, Plaintiff has produced an email chain between him and Mr. Blood on September 28, 2018 in which Mr. Blood could be reasonably understood to have

12

acknowledged "the pending termination." Dkt. 47-24. Mr. Blood, Defendant's CEO, went so far as to empower Plaintiff to submit additional information to Defendant's in-house counsel and schedule a meeting with Ms. Leahy "to discuss the investigation." *Id.* at 1. Lastly, Mr. Blood guaranteed to Plaintiff that "[a]ny additional information [Plaintiff] submit[s] will be taken into consideration." *Id.* A favorable but reasonable reading, as this Court must make, as to this evidence, suggests a jury could find that the CEO was well-informed of the incident, enjoyed oversight authority of the investigation, and by implication, the power to direct the termination of Plaintiff.

The Court also draws on the declaration of Mr. Storms—whose testimony is permitted as outlined by this Court's prior Order. Dkt. 62. Mr. Storms' declaration maintains that he conducted an investigation into Ms. Sylver's lone allegation that Plaintiff had sent her a picture of a scantily clad woman in a bikini and determined that the allegation did not rise to the level of sexual harassment. Dkt. 47 ¶ 20. After Mr. Storms presented his findings to Ms. Leahy, which he claims she requested, Ms. Leahy indicated to Mr. Storms that she agreed with the results of his investigation. *Id.* ¶ 24. On September 19, 2018, Mr. Blood visited Mr. Storms' office for a meeting. *Id.* ¶¶ 23-25. In that meeting, Mr. Storms claims that he asked Mr. Blood about Plaintiff's case and Mr. Blood informed him that the Company would terminate Plaintiff for the alleged sexual harassment of Ms. Sylver.

A reasonable inference from these events could lead a jury to conclude that Mr. Blood believed that Plaintiff's termination was sufficient on sexual harassment grounds alone—of which Ms. Leahy's report only cites the bikini picture as support. Therefore, while Ms. Leahy's report recommended termination on the combined grounds of both sexual harassment and the violation of certain other Company policies, Mr. Blood's alleged statement to Mr. Storms insinuates Mr.

13

Blood's influence in the employment decision. And because nothing in Ms. Leahy's report upon which Ms. Howard-Watts relied suggests that Plaintiff would have been terminated if he had not been found to have sexually harassed Ms. Sylver, there is sufficient evidence to suggest that removing the sexual harassment charge, and the implicit sex discrimination allegedly undergirding that charge, "would have yielded a different choice by the employer" such that a jury could find that "a statutory violation has occurred." *Bostock*, 140 S. Ct. at 1741. In fact, Ms. Leahy's report applies the Company's old disciplinary rubric by citing three applicable disciplinary charges, each worth 6 points, to eclipse the 15-point threshold required to recommend termination of any employee. *See* Dkt. 47-22 at 7-8.

Based on the evidence presented, a reasonable jury could determine that if the sexual harassment violation were removed from the report, Ms. Leahy would then only have 12 points against Plaintiff and thus she would be unable to recommend termination. From the evidence presented by Plaintiff, there is a dispute as to the material fact of whether Mr. Blood was a decisionmaker in any capacity in the leadup to Plaintiff's termination. As such, Mr. Blood's alleged statement may "reflect directly the alleged discriminatory attitude" of the Company and "bear directly on the contested employment decision" involving Plaintiff. *Warch*, 435 F.3d at 520.

The same can also be said of Mr. Daniels. Under oath, Plaintiff claims that Mr. Daniels told him that "it was better for the company to fire [Plaintiff] than contend with a female employee claiming sex harassment" and that "it was because of the bikini photograph" that Plaintiff was going to be fired. Dkt. 47-1 ¶ 30. Tellingly, although contested by Mr. Daniels, Plaintiff claims that Mr. Daniels told him he could send an email to Mr. Blood appealing the decision and that once Mr. Blood received that appeal, Mr. Daniels would recommend to Mr. Blood that Plaintiff

14

not be fired to avoid a "strong wrongful termination lawsuit against [the Company]."[7] *Id.* ¶ 31. Not only does this alleged, albeit contested, exchange suggest there is a dispute as to whether Mr. Blood was the chief decision maker with respect to the complaint against Plaintiff, it also evidences that Mr. Daniels played a direct role in that decision-making process. Both Mr. Daniels and Mr. Blood's alleged comments also occurred days prior to the onboarding of Ms. Howard-Watts. This disputed fact proves material as it reasonably may cast doubt on Defendant's position that Ms. Howard-Watts was the sole decision maker in the termination of Plaintiff.

However, "inadmissible hearsay evidence…, as a matter of law, cannot create a factual dispute." *Johnson v. Runyon*, 928 F. Supp. 575, 585 (D. Md. 1996) (citing *Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995)). The value of the alleged statements made by Mr. Blood and Mr. Daniels is that they were true; if they were not indicative of their motive, then Plaintiff would have no potential direct evidence of sex discrimination. Therefore this Court must assess whether the purported statements of Mr. Blood and Mr. Daniels are admissible for this dispute to have any traction at trial.

### A. Mr. Blood's Alleged Statement

Plaintiff is seeking to present Mr. Blood's statement to Mr. Storms that "[i]t is easier and cheaper to fire a man rather than fight a woman who filed sexual harassment claims. Just look at the news[,]" for the truth of the matter asserted. Dkt. 47-2 ¶ 29.[8] This Court finds that such a statement nonetheless would be admissible under Federal Rule of Evidence 801(d)(2)(D).

---

[7] Defendant admits that Plaintiff and Mr. Daniels met shortly before Plaintiff received the notice of an impending termination on October 1, 2018; however, Defendant maintains that Plaintiff initiated the meeting, that the meeting occurred on or about October 1, 2018, and that Mr. Daniels made no such sex-charged statement and instead only offered to ask if the Company's leadership would accept Plaintiff's resignation in lieu of termination. Dkt. 32-5 ¶ 9.

[8] While Defendant argues that Mr. Blood's statement is patently inadmissible—presumably because of its view that Mr. Storms could not testify at trial—this Court's subsequent

"The definitional exemption for individual admissions is extraordinarily broad." *Jordan v. Binns*, 712 F.3d 1123, 1128 (7th Cir. 2013) (citing Federal Rule of Evidence 801(d)(2) advisory committee's note) (calling for "generous treatment of this avenue of admissibility"); *see also* C.B. Mueller, L.C. Kirkpatrick & C.H. Rose III, Evidence Practice Under the Rules § 8.27, at 909 (4th ed. 2012) (noting that the hearsay exemption for individual admissions "has almost infinite breadth"). The admissibility of party admissions do not turn on trustworthiness, *see United States v. McKeon*, 738 F.2d 26, 32 (2d Cir. 1984), in large part because the party against whom the admission is offered usually can "explain, deny, or rebut the statements" on the stand. *Binns*, 712 F.3d at 1128 (citing *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1045 (8th Cir. 2010)). A statement must simply be made by a party and offered against that party. *See United States v. Matlock*, 415 U.S. 164, 172 n.8 (1974).

Here, Mr. Storms may testify to Mr. Blood's statement because it is a party admission under Federal Rule of Evidence 801(d)(2)(D) which provides, in pertinent part, that a "statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." As to matters involving employment decisions, this circuit has required independent evidence to show that the declarant had some level of authority in the matters involving the employment decision at issue. *Parker v. Danzig*, 181 F. Supp. 2d 584, 592 (E.D. Va. 2001) ("[I]n the context of a Title VII employment discrimination case, FRE 801(d)(2)(D)

---

Order approving the testimony of Mr. Storms at trial eliminates any double hearsay issue. Dkt. 62. To resolve any doubt, this Court has limited the use of documents or information disclosed in discovery in connection with Mr. Storms' testimony at trial. But Mr. Storms' memo provided to Defendant ahead of discovery provides a foundation to testify to Mr. Blood's alleged statement. *See* Dkt. 51-2 at 1 (describing Mr. Storms' meeting with Mr. Blood, the same meeting in which Mr. Blood is alleged to have made the statement).

requires the statement's proponent to demonstrate that the scope of the declarant's authority included matters related to the employment action at issue."); *see also Hassman v. Caldera*, No. 00-1104, 2000 WL 1186984, at *2, 229 F.3d 1142 (4th Cir. Aug. 22, 2000) (citing *Precision Piping & Instr., Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 619-20 (4th Cir. 1991) (requiring that under Rule 801(d)(2)(D), "the proponent for admission must produce independent evidence showing that the scope of the declarant's authority included the matters discussed in the alleged conversation").[9] Courts are primarily concerned with whether the agent had "the ability to influence a personnel decision." *Johnson v. Kroger Co.*, 319 F.3d 858, 868 (6th Cir. 2003); *see also Jacklyn v. Schering Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999) (finding party admission applies to an employee-declarant who was "involved in any of the critical appraisals of [plaintiff's] performance that preceded [plaintiff] leaving work."); *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950 (7th Cir. 1998) (rejecting reading into Rule 801(d)(2)(D) "a generalized personal involvement requirement, especially in light of the Advisory Committee's admonition that the freedom which admissions have enjoyed . . . from the restrictive influences . . . of the rule requiring firsthand knowledge . . . calls for generous treatment of this avenue to admissibility.").

As this Court has already highlighted, Mr. Blood's email to Plaintiff on September 28, 2018 provides independent evidence that he in fact had, at minimum, some level of influence over

---

[9] When demonstrating a declarant was acting within the scope of his agency or employment, the requisite evidentiary showing is more exacting for Title VII cases where an employment decision is made. *See, e.g.*, *Sutton v. Roth, L.L.C.*, 361 F. App'x 543, 547-48 (4th Cir. 2010) (quoting *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 321 (4th Cir. 1982)) (holding, *in a negligence and breach of warranty case*, that "[t]o introduce a statement under 801(d)(2)(D) the record must reveal 'independent evidence establishing the existence of the agency'" and finding that a declarant wearing a McDonald's uniform who responded to questions about McDonald's while working at a McDonald's restaurant constituted "sufficient evidence of agency" in regards to a party admission presented against that party).

the investigation.[10] The fact that Mr. Blood made his alleged remarks in his capacity as President and CEO of the Company further bolsters this determination.

Additionally, this Court does not find that Mr. Blood's statement is "so unreliable that its probative value is substantially outweighed by the danger of prejudice and confusion" under Federal Rule of Evidence 403. 4 Weinstein & Berger, Weinstein's Evidence ¶ 805[01]. Rather this Court here exercises its discretion "in administering evidentiary rules [] designed to reach optimum utility in [this Court's] truth-finding role[]." *Precision Piping*, 951 F.2d at 620. Admitting Mr. Blood's alleged statement achieves that end. Therefore, Mr. Blood's alleged statement is admissible at trial for the truth of the matter asserted.

*ii. Mr. Daniels' Alleged Statement*

Plaintiff also seeks to raise Mr. Daniels' alleged statement that "it was better for the company to fire [Plaintiff] than contend with a female employee claiming sex harassment" for the truth of the matter in order to establish another basis for a genuine dispute as to whether Plaintiff can show sex-based discriminatory pretext on the part of Defendant. While this statement could be admitted at trial on a non-hearsay basis for the effect it had on Plaintiff as the listener under Federal Rule of Evidence 801 because it arguably prompted Plaintiff to reach out to Mr. Blood over email on September 28, 2018 to contest his pending termination, it would not be admitted for the truth of the matter.

In order to present Mr. Daniels' alleged statement at trial for the truth of the matter asserted, this Court applies the same Rule 801(d)(2)(D) analytical framework. Although independent evidence exists in Ms. Leahy's report and Defendant's interrogatories to suggest that Mr. Daniels

---

[10] As for fairness, because Mr. Blood is expected to be called as a witness, he will have every opportunity to convince a jury otherwise. *See* Dkt. 20.

was in contact with the Company's human resources department and other members of leadership in connection with Plaintiff's case, there is not sufficient independent evidence to establish that Mr. Daniels had the ability to influence employment decisions at the Company. While Plaintiff alleges that Mr. Daniels said he could make a recommendation to Mr. Blood not to terminate Plaintiff, the ability to make a recommendation, without more, does not establish that an employee exercises influence over employment decisions. Moreover, seeing no other feasible route around the hearsay problem, this Court considers the residual exception to the hearsay requirement under Federal Rule of Evidence 807. This analysis also presents a dead end. Mr. Daniels' alleged statement is *not* "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2). If anything, Mr. Blood's alleged statement is more probative given Mr. Blood's superior role in the Company.

Notwithstanding the hearsay problem attached to Mr. Daniels' statement, the contested direct evidence of Mr. Blood's alleged statements proffered by Plaintiff creates a dispute of material fact for which a jury is best suited to evaluate. It is not within this Court's province to "weigh the evidence or make credibility determinations." *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019).

Because this Court finds that Mr. Blood's alleged role in Plaintiff's termination and his associated comments are direct evidence of discriminatory motive, this Court need not visit whether Plaintiff has established an indirect discrimination claim under Title VII. Ultimately, this Court concludes that a genuine issue of material fact exists as to whether Plaintiff can show a direct sex-based discriminatory pretext on the part of Defendant. Accordingly, Plaintiff's Title VII claim may proceed to trial.

## IV.  CONCLUSION

For the reasons set forth above, it is hereby ORDERED that Defendant's Motion (Dkt. 31) is DENIED.

The Clerk is directed to forward copies of this Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
March 23 2022

                                                     /s/
                                        Rossie D. Alston, Jr.
                                        United States District Judge